# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TSC RESEARCH, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OPINION** |
| v. ) | **AND RECOMMENDATION** |
| ) | |
| BAYER CHEMICALS ) | 1:06CV701 |
| CORPORATION and ) | |
| LANXESS CORPORATION, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on a motion for summary judgment (docket no. 63) filed by Defendants Bayer Chemicals Corporation ("Bayer") and Lanxess Corporation ("Lanxess").[1] Plaintiff TSC Research, LLC ("TSC") has responded to the motion, Defendants have filed a reply, and, in this posture, the matter is ripe for consideration. Furthermore, because the parties have not consented to the jurisdiction of the magistrate judge, I must address the motion by way of recommendation. For the following reasons, it will be recommended that the court deny Defendants' motion for summary judgment.

**STATEMENT OF CASE**

Plaintiff TSC filed its initial complaint in the Guilford County Superior Court on July 23, 2006. Defendants removed the case to this court on August 22, 2006, based on federal question jurisdiction, and filed a motion to dismiss on

---

[1] Lanxess is the successor corporation to Bayer Chemicals.

September 25, 2006. On October 27, 2006, Plaintiff filed an amended complaint (docket no. 16), and Defendants filed a motion to dismiss the amended complaint on November 20, 2006 (docket no. 21).[2] On November 29, 2007, Magistrate Judge Eliason recommended that the motion to dismiss be granted as to six of the causes of action pled by Plaintiff, but recommended that the motion to dismiss as to the breach of contract and quantum meruit claims be denied (docket no. 44). The district court adopted the Recommendation by order dated March 4, 2008 (docket no. 49). Defendants have now moved for summary judgment on the two remaining claims.

**FACTUAL BACKGROUND**

Plaintiff TSC is a North Carolina company owned by Douglas Hooper and Larry Matheson. By 2003, TSC had developed and obtained ownership rights to a proprietary phase change technology referred to in this lawsuit as the "TSC Process."[3] In early 2003, TSC approached Bayer regarding the possibility of Bayer developing and marketing the TSC Process to end users. On April 25, 2003, the

---

[2] By text order on November 21, 2006, the court denied the first motion to dismiss as moot by virtue of the filing of the amended complaint.

[3] According to the amended complaint, the TSC Process refers to the chemical technology and application technology consisting of innovative processes as to the chemicals used, the methodology of applying such chemicals to textile substrates to enhance fabrics in garments and other textile products, and the knowledge and experiences with customers for those products. (Am. Compl. ¶¶ 5 - 7.) The enhancements made the textile products more effective in thermal switching and moisture absorbency with application to the healthcare, institutional, industrial, and consumer products markets. (*Id.*) Products made with this technology are commonly referred to as "smart fabrics." (*Id.*)

-2-

parties signed a Disclosure Agreement, providing for the disclosure of confidential information between the parties. This agreement was prepared by Bayer and signed on its behalf by Dean Bender. In June 2003, the parties began to discuss the possibility of Bayer becoming an exclusive licensee for the TSC Process. While the parties had shared some information at this point, TSC had not yet disclosed its most sensitive proprietary information, such as chemical composition and specifications for the application of the chemicals at the heart of the TSC Process.

Negotiations continued between the parties and Hooper, one of the TSC principals, testified that he went to the Bayer offices on multiple occasions expecting to sign a written agreement which was to be prepared by the legal department at Bayer. On October 23, 2003, the parties executed a Letter of Intent ("LOI") to Execute the Exclusive Technology Licensing Agreement ("ETLA"). The LOI, which was signed by the parties, "confirm[ed] the desire of [the parties] to execute the attached "Exclusive Technology Licensing Agreement pending any necessary final approvals." The LOI goes on to provide:

> TSC and Bayer recognize that Legal Council [sic] and others in an organization must often review Licensing Agreements prior to final approval. To avoid the time delays and to expedite the introduction of the Technology both Parties enter into this Letter of Intent in good faith.
>
> This Letter of Intent will serve to insure that Bayer receives the Exclusive Technology Licensing Agreement as proposed, that TSC and Bayer will begin immediately to develop the marketing, development and research strategy as if the Agreement has been finalized and that TSC will not offer the Agreement to any other person or Organization.

-3-

> TSC and Bayer recognize that time is of the essence. TSC will work closely with Bayer representatives reviewing the Agreement to expedite the final Approval and Bayer will in turn make every effort to expedite the final approval of the Agreement.

(Def.'s Ex. 9, LOI). According to Hooper, the parties had agreed upon the terms of the agreement in earlier meetings, but a final document had not been completed by the Bayer legal department, so after some delay, Bender printed, or had someone print, the LOI and ETLA in substitution for the document from the legal department. (Hooper dep. 88-89). Hooper was told that the LOI and ETLA were drafted by Bender and that Bender was authorized to approve the document. (Hooper dep. 104). The LOI, which referenced the attached ETLA, was signed by Bender and Hooper. The signature lines on the ETLA were left blank.

The ETLA, attached to the LOI, provides that TSC would turn over "[t]he chemicals, formulas, technology, improvements and application procedures" to Bayer, along with all customer contacts, and it further required TSC to "actively support Bayer's sales efforts as requested by Bayer." (Def.'s Mot. for Summ. J., Ex. 9, ETLA ¶ 7). The ETLA also contained a provision for a minimum royalties payment of $30,000 per month from Bayer to TSC for a period of six months from the date of the Agreement, with payments increasing to $50,000 per month thereafter. (*Id.* ¶ 9). The ETLA provided that the term of the licensing agreement was fifteen (15) years. (*Id.* ¶ 5).

-4-

Hooper testified that when he and Bender signed the LOI, he "considered it was a complete deal, a signed document." (Def. Mot. for Summ. J., Tab 2, Hooper dep. 108). The ETLA provided that TSC would provide the TSC Process technology to Bayer and Bayer would begin marketing the technology. As such, TSC then provided the formula and other proprietary information to Bayer, "which [TSC] wouldn't have done if [the LOI] hadn't been a completed and executed document." (*Id.*) Bender himself testified that his understanding was that "during this period under the letter of intent [Bayer] would have an exclusive arrangement with TSC to where we could go through the processes, Bayer evaluate the product, work with customers, do those things without fear that TSC would go to another competitor or something with the technology." (Def. Mot. for Summ. J., Tab 1, Bender dep. 235). In the months following October 2003, TSC billed Bayer for services provided in the amount of $30,000 per month and Bayer paid these invoices for four months. In addition, Bayer announced to its employees and to third parties that it had acquired the TSC technology and held numerous customer meetings to explain the smart fabric products. Bayer investigated trade names for the enhanced products and developed business and marketing plans for their introduction. (Bender dep. 113).

Approximately eighteen months later, Bayer reorganized its corporate structure, shedding some of its business entities and spinning off its chemical division into the new Lanxess Corporation, an independent subsidiary. In the course

-5-

of this reorganization, Dean Bender resigned his position at Bayer.  In a June 2004 meeting, Lanxess informed TSC that it required further information, tests, and evaluations to determine if it would continue with the TSC process.  (Bender dep., Ex. 25).  These tests were, according to Lanxess Vice-President Firuza Mir, the result of the due diligence assessment of the TSC technology by the new Lanxess staff.  (Mir dep. 95).  Lanxess then decided not to move forward with the marketing of the TSC Process because, according to Mir, "the technology didn't work."  (*Id.* at 51).  In July 2004, TSC's legal counsel contacted Lanxess' counsel and informed them that TSC was contemplating filing a lawsuit.  No complaint was filed at that time, however, and on March 14, 2005, a one-year Tolling Agreement was executed between the parties since Lanxess represented to TSC that it wanted to explore in earnest the possibility of moving forward with developing and marketing the TSC Process.  During this period, according to Plaintiff, Lanxess did not reevaluate or perform further tests on the technology.  In July 2006, TSC filed this lawsuit.

**STANDARD OF REVIEW**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 586-87 (1986) (quoting FED. R. CIV. P. 56(e)).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir. 1995). Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251 (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. With these principles in mind, the court will address the motion for summary judgment.

**DISCUSSION**

-7-

Case 1:06-cv-00701-WO-WWD   Document 89   Filed 07/16/09   Page 7 of 13

**Breach of Contract Claim**

This action is, at its core, a breach of contract case. In North Carolina, the general test for the existence of a contract is fairly simple: "A contract is the agreement of two minds - the coming together of two minds on a thing done or to be done." *Williams v. Jones*, 322 N.C. 42, 49, 366 S.E.2d 433, 438 (1988) (quotation marks and citation omitted). Further, "[i]t is well-settled in North Carolina that a contract will not be held unenforceable because of uncertainty if the intent of the parties can be determined from the language used, construed with reference to the circumstances surrounding the making of the contract, and its terms reduced to a reasonable certainty." *Brawley v. Brawley*, 87 N.C. App. 545, 549, 361 S.E.2d 759, 762 (1987) (citing *Goodyear v. Goodyear*, 257 N.C. 374, 126 S.E.2d 113 (1962); *Childress v. Abeles*, 240 N.C. 667, 84 S.E.2d 176 (1954)); *see also Arndt v. First Union Nat'l Bank*, 170 N.C. App. 518, 522, 613 S.E.2d 274, 278 (2005) (holding that the intentions of the parties may be discerned from both their writings and their actions).

The dispositive issue before the court is whether, in fact, there is a valid contract between TSC and Bayer/Lanxess. As this court noted in its previous recommendation, under North Carolina law a contract does not exist where the parties merely negotiate with the anticipation that their agreement will ultimately be memorialized in a later document. *Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007). Likewise, agreements containing an unmet condition

precedent are also unenforceable. *Id.* A contract to enter into a future contract, however, may be enforced if it specifies all of the "material and essential terms." *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974). "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." *Snyder v. Freeman*, 300 N.C. 204, 217, 266 S.E.2d 593, 602 (1980).

Defendant, in arguing that no contract existed, urges this court to follow the reasoning of *Cole v. Champion Enterprises, Inc.*, 496 F. Supp. 2d 613 (M.D.N.C. 2007). While there is language in *Cole* supporting Defendant's position, the facts in *Cole* are inapposite. The plaintiff in *Cole* alleged that he had an oral employment agreement which was enforceable. The court, however, found that there was no agreement because, among other things, any such employment contract required corporate Board approval, which was never given, all previous employment contracts between the parties had been reduced to writing, and there was never a meeting of the minds on the terms of the agreement, as those terms were still being negotiated by the parties. As the Fourth Circuit noted in affirming the decision of the district court: "These negotiations prevented [the parties] from reasonably believing that they were already obligated by an enforceable agreement . . . ." *Cole v. Champion Enters., Inc.*, 305 F. App'x. 122, 129 (4th Cir. 2008).

The other primary case relied upon by Defendant, *Volumetrics Medical Imaging, Inc. v. ATL Ultrasounds, Inc.*, is equally inapposite. 243 F. Supp. 2d 386

-9-

(M.D.N.C. 2004). In *Volumetrics*, the parties met to discuss a joint venture to develop and market an ultrasound machine. During the preliminary discussions, a "term sheet" was generated, containing suggested terms of the agreement between the parties. This term sheet was not signed by either party and nowhere did the document indicate that the sheet represented a final agreement between the parties. In its lawsuit, the plaintiff relied upon this document for its breach of contract claim. In granting summary judgment on this claim, the court detailed the lack of definitive terms in the term sheet, including "the parties' respective duties," and further noted that the document did not "contain the requisite expression of intent." 243 F. Supp. 2d at 401-02.

In the present case, the parties executed the LOI, to which the ETLA was attached. There really is no question about the intent of the parties to enter into an exclusive licensing arrangement, nor is there any language indicating that there are terms still remaining to be negotiated. A jury could find, based on the LOI and the attached ETLA, that the parties had agreed upon all major terms of the contract and were operating under that contract. Based upon the deposition testimony and other evidence, as corroborated by subsequent actions by the parties, with all reasonable inferences drawn and doubts resolved in favor of Plaintiff, this court cannot conclude as a matter of law that the parties did not reach a sufficiently definite and enforceable agreement. Plaintiff's principal, Douglas Hooper, testified that he was led to believe by Bayer's Dean Bender, who had drafted the documents at issue here, that the October 22, 2003, LOI and ELTA reflected the complete terms, as

agreed upon by the parties, for the license of the TSC Process. Moreover, the parties proceeded as if there were a contract; TSC turned over its proprietary information about the TSC Process to Bayer, as contemplated by the agreement, and Bayer went about testing and marketing the technology. Bayer also commenced making the $30,000 monthly payments provided for under the agreement. A jury could find from internal Bayer documents, which were produced in discovery, that officials at that corporation understood that they had a license from TSC by which they were to develop and market the technology.

In these circumstances, whether a contract existed is a question for the jury. *See Arndt v. First Union Nat'l Bank*, 170 N.C. App. 518, 523, 613 S.E.2d 274, 278-79 (N.C. App. 2005) (citing *Goeckel v. Stokely*, 236 N.C. 604, 607, 73 S.E.2d 618, 620 (1952). Thus, summary judgment should be denied on this claim.

### *Quantum meruit* claim

Plaintiff has also asserted an alternative cause of action in *quantum meruit*, alleging that it rendered certain technical assistance and provided information to Defendant for which Plaintiff is entitled to be paid. (Am. Compl. ¶ 103).

> *Quantum meruit* is a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment. It operates as an equitable remedy based upon a quasi contract or a contract implied in law. A quasi contract or contract implied in law is not a contract. An implied contract is not based on an actual agreement, and *quantum meruit* is not an appropriate remedy when there is an actual agreement between the parties. Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment.

-11-

*Whitfield v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414-15 (1998) (internal citations omitted). Plaintiff obviously asserts this claim in the alternative to its breach of contract claim; that is, should a jury find that no express contract existed between these parties, Plaintiff seeks the reasonable value of its technical services and proprietary information provided to Defendant. To recover in *quantum meruit*, a plaintiff must show that (1) services were rendered to the defendant; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously. *Scott v. United Carolina Bank*, 130 N.C. App. 426, 429, 503 S.E.2d 149, 152 (1998). There is evidence that Plaintiff provided proprietary information to Bayer and worked with Defendant, in multiple customer meetings, to develop markets and consumer applications for the technology. It is undisputed that there were many documents and other materials turned over to Defendant after the execution of the LOI. There is no evidence that these services were rendered gratuitously to Defendant or that Plaintiff did not expect to be paid for the technical expertise and information provided to Bayer. Plaintiff cannot recover on both the breach of contract and *quantum meruit* claims; that is, if a jury were to find that the parties had entered into a valid contract, the terms of that agreement will control and the jury will not be able to consider Plaintiff's *quantum meruit* theory of recovery. On the other hand, if the jury were to find that the parties did not enter into a valid contract, then Plaintiff's *quantum meruit* claim would be viable. At this stage in the

proceeding, however, there are genuine issues of material fact which make it premature to grant summary judgment on Plaintiff's *quantum meruit* claim.

**CONCLUSION**

For the reasons stated above, it is **RECOMMENDED** that the court **DENY** Defendant's motion for summary judgment (docket no. 63) and that the matter proceed to trial.

                                     /s/ Wallace W. Dixon
                                     WALLACE W. DIXON
                                     United States Magistrate Judge

Durham, NC
July 16, 2009